# STATE OF LOUISIANA
## COURT OF APPEAL, THIRD CIRCUIT

### 12-1100

**FERNEN LOUIS ANDREPONT, ET AL.**

**VERSUS**

**CHEVRON USA, INC., ET AL.**

\*\*\*\*\*\*\*\*\*\*

APPEAL FROM THE
FIFTEENTH JUDICIAL DISTRICT COURT
PARISH OF ACADIA, NO. 2008-10045
HONORABLE JOHN D. TRAHAN, DISTRICT JUDGE

\*\*\*\*\*\*\*\*\*\*

**JIMMIE C. PETERS
JUDGE**

\*\*\*\*\*\*\*\*\*\*

Court composed of Sylvia R. Cooks, John D. Saunders, and Jimmie C. Peters, Judges.

**AFFIRMED.**

**Stephen B. Murray**
**Arthur M. Murray**
**Jessica W. Hayes**
**Korey A. Nelson**
**Murray Law Firm**
**650 Poydras Street, Suite 2150**
**New Orleans, LA 70130**
**(504) 525-8100**
**COUNSEL FOR PLAINTIFFS/APPELLANTS:**
     Fernen Louis Andrepont, et al.

Stuart H. Smith
Michael Gregory Stag
Amber E. Cisney
Smith Stagg, L.L.C.
365 Canal Street, Suite 2850
New Orleans, LA 70130
(504) 593-9600
COUNSEL FOR PLAINTIFFS/APPELLANTS:
       Fernen Louis Andrepont, et al.


Warren A. Perrin
Perrin, Landry, Delaunay, Dartez & Ouellet
P.O. Box 53597
Lafayette, LA70505
(337) 233-5832
COUNSEL FOR PLAINTIFFS/APPELLANTS:
       Fernen Louis Andrepont, et al.


Morgan J. Wells, Jr.
Day M. Peacocke
Stephen M. Larzelere
Evan J. Godofsky
Larzelere Picou Wells Simpson Lonero, LLC
3850 North Causeway Bloulavrd
Two Lakeway Center, Suite 1100
Metairie, LA 70002
(504) 834-6500
COUNSEL FOR DEFENDANT/APPELLEE:
       Radke Oil Co., Inc.


Thomas E. Balhoff
Judith R. Atkinson
Carlton Jones, III
Rodell Parsons Koch Blanche Balhoff & McCollister
8440 Jefferson Highway, Suite 301
Baton Rouge, LA 70809-7652
(225) 929-7033
COUNSEL FOR INTERVENOR/APPELLEE:
       Office of Conservation
       Louisiana Deptartment of Natural Resources
       Commissioner of Conservation James Welsh


Charles R. Minyard
P. O. Box 3642
Lafayette, LA 70502
(337) 266-2300
COUNSEL FOR DEFENDANT/APPELLEE:
       Apache Corporation

**George Arceneaux, III**
**Jamie D. Rhymes**
**Penny L. Malbrew**
**Liskow & Lewis**
**P. O. Box 52008**
**Lafayette, LA 70505**
**(337) 232-7424**
**COUNSEL FOR DEFENDANT/APPELLEE:**
    **BP Corporation North America, Inc.**

**Kyle P. Polozola**
**Dupuis & Polozola, LLC**
**P. O. Box 2698**
**Lafayette, LA 70502**
**(337) 235-2232**
**COUNSEL FOR DEFENDANT/APPELLEE:**
    **BP Corporation North America, Inc.**

**Katie Caswell Cambre**
**Robert B. McNeal**
**Mark L. McNamara**
**James E. Lapeze**
**Liskow & Lewis**
**701 Poydras Street, Suite 5000**
**New Orleans, LA 70139-5099**
**(504) 581-7979**
**COUNSEL FOR DEFENDANT/APPELLEE:**
    **ExxonMobil Corporation**

**Michael R. Phillips**
**L. Victor Gregoire, Jr.**
**Esteban Herrera, Jr.**
**Kimberly K. Hymel**
**Melissa M. Cresson**
**Kean, Miller, etc.**
**P. O. Box 3513**
**Baton Rouge, LA 70821**
**(225) 387-0999**
**COUNSEL FOR DEFENDANT/ APPELLEE:**
    **Chevron USA, Inc., et al.**

**PETERS, J.**

The numerous plaintiffs in this oilfield contamination litigation appeal the trial court's grant of a summary judgment dismissing their claims against one of the defendants, Radke Oil Company, Inc. For the following reasons, we affirm the trial court judgment.

## DISCUSSION OF THE RECORD

The plaintiffs are individual owners of immovable property located in Acadia Parish, Louisiana, located near the historic Jennings Field, the site of the first oil production in Louisiana. This litigation began on January 16, 2006, when the plaintiffs, Fernen Louis Andrepont, Stacy H. Britt, Barbara Miller Chapman, Glenn D. Daigle, Sr., Anita D. Decker, the Fruge Children Trust, Raven Gotte, Jr., Carroll Hebert, David Wayne Hebert, Norman Hebert, Aulden R. Miller, Kenneth L. Miller, Jr., Steven J. Simar, and Patricia A. Vidrine, filed suit against twelve named defendants[1] seeking damages for the contamination of their properties caused by oil and gas exploration in the nearby Jennings Field. Only one of the twelve defendants, Radke Oil Company, Inc. (Radke), is involved in this appeal.

In their petition, the plaintiffs asserted their ownership of individual tracts of immovable property located in Sections 42 and 43, Township 9 South, Range 2 West, in Acadia Parish. They alleged that Radke and the other defendants, in conducting oil and gas drilling and production activities on or near their properties, had in the past utilized unlined earthen pits for the storage of oilfield wastes, and this utilization resulted in the contamination of their properties. They further

---

[1] The named defendants are Chevron U.S.A. Inc., successor in interest to Gulf Oil Company and Texaco, Inc.; Exxon Mobil Corporation, successor in interest to Exxon Corporation, Humble Oil & Refining Company, and Superior Oil Company; Radke Oil Company, Inc.; Great Southern Oil & Gas Company, Inc.; EOG Resources, Inc.; BP Corporation North America Inc., successor in interest to Yount Lee Oil and Amoco Production Company; Shell Oil Company; Kerr-McGee Oil and Gas Corporation, successor in interest to Sun Exploration-Production; Apache Corporation; Source Petroleum, Inc.; L&L Oil and Gas Services, Inc.; and Denovo Oil & Gas, Inc.

asserted that despite knowing from the 1930s, that the use of unlined pits led to surface and subsurface contamination, the defendants continued using these pits for the storage of oilfield wastes, which included naturally occurring radioactive materials, technically enhanced radioactive materials, drilling fluids, chlorides, hydrocarbons, and heavy metals. According to the plaintiffs' allegations, other contamination to their properties was caused by the "leaks, spills, and other discharges from oil wells, pipelines, tank batteries, plants and other equipment owned or operated by" defendants. The plaintiffs alleged that although the defendants knew or should have known that their day-to-day operations would lead to contamination, they refused to remove the pollution and toxic wastes caused by their endeavors and chose, instead, to hide it. This, the plaintiffs alleged, allowed the pollution and toxic waste to migrate and spread to the soils, surface waters, and groundwater of their properties. Based on the above stated facts, the plaintiffs sought monetary damages based on theories of negligence, trespass, strict liability, strict liability for ultra-hazardous activity, and breach of contract and obligations as lessee.

The early procedural aspects of this litigation involved consideration of numerous exceptions filed in response to the plaintiffs' petition and resulted in the plaintiffs' pleadings being amended extensively.[2] The issue giving rise to this appeal was raised by Radke in a motion for summary judgment filed on September 20, 2011. Following a February 2, 2012 hearing, the trial court granted Radke's motion and dismissed the plaintiffs' claims against it. The trial court executed a judgment to this effect on the same day as the hearing, and the plaintiffs perfected this appeal. In their appeal, they raise two assignments of error:

---

[2] These amendments included the addition of other parties to the litigation.

1. The judgment is contrary to law because the trial court improperly concluded that Radke met its initial burden on summary judgment.

2. The judgment is contrary to law because the trial court improperly imposed a heightened evidentiary standard on the Plaintiffs when it rejected the evidence submitted by the Plaintiffs as insufficient to create an issue of material fact.

## OPINION

The law pertaining to summary judgment was exhaustively reviewed by the supreme court in the recent case of *Schultz v. Guoth*, 10-343, pp. 5-7 (La. 1/19/11), 57 So.3d 1002, 1005-06 (alteration in original):

> A motion for summary judgment is a procedural device used when there is no genuine issue of material fact for all or part of the relief prayed for by a litigant. *Samaha v. Rau*, 07-1726, pp. 3-4 (La.2/26/08), 977 So.2d 880, 882-83; *Duncan v. U.S.A.A. Ins. Co.*, 06-363, p. 3 (La.11/29/06), 950 So.2d 544, 546, *see* La.Code Civ. Proc. art. 966. "A summary judgment is reviewed on appeal de novo, with the appellate court using the same criteria that govern the trial court's determination of whether summary judgment is appropriate; i.e. whether there is any genuine issue of material fact, and whether the movant is entitled to judgment as a matter of law." *Samaha v. Rau*, 07-1726, pp. 3-4, 977 So.2d at 882-83.

> A motion for summary judgment will be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to material fact, and that mover is entitled to judgment as a matter of law." La.Code Civ. Proc. art. 966(B). This article provides that "the summary judgment procedure is designed to secure the just, speedy, and inexpensive determination of every action . . . . The procedure is favored and shall be construed to accomplish these ends." La.Code Civ. Proc. art. 966(A)(2). La.Code Civ. Proc. art. 966(C)(2) sets forth the burden of proof in summary judgment proceedings, providing:

>> The burden of proof remains with the movant. However, if the movant will not bear the burden of proof at trial on the matter that is before the court on the motion for summary judgment, the movant's burden on the motion does not require him to negate all essential elements of the adverse party's claim, action, or defense, but rather to point out to the court that there is an absence of factual support for one or more elements essential to the adverse party's claim, action, or defense. Thereafter, if the

3

> adverse party fails to produce factual support sufficient to establish that he will be able to satisfy his evidentiary burden of proof at trial, there is no genuine issue of material fact.
>
> This provision initially places the burden of producing evidence at the hearing on the motion for summary judgment on the mover, who can ordinarily meet that burden by submitting affidavits or by pointing out the lack of factual support for an essential element in the opponent's case. *Samaha v. Rau*, 07-1726, p. 4, 977 So.2d at 883. "At that point, the party who bears the burden of persuasion at trial (usually the plaintiff) must come forth with evidence (affidavits or discovery responses) which demonstrates he or she will be able to meet the burden at trial . . . . Once the motion for summary judgment has been properly supported by the moving party, the failure of the non-moving party to produce evidence of a material factual dispute mandates the granting of the motion." *Id.* (quoting *Wright v. Louisiana Power & Light*, 06-1181, p. 16 (La.3/9/07), 951 So.2d 1058, 1069-70).

Radke attached to its September 20, 2011 motion for summary judgment, a memorandum in support of the motion; copies of answers to interrogatories it propounded to the plaintiffs; thirty-one pages of requests for production propounded to the plaintiffs; and the affidavit of Lee A. Day, a senior geologist with Toxicological and Environmental Associates, Inc. in Baton Rouge, Louisiana.

In their answers to the interrogatories, the plaintiffs acknowledged that they had no evidence of leaks, spills, or discharges attributable to operations by Radke nor did they have any information to suggest that Radke ever disposed of oilfield waste in unlined earthen pits on or near any of their property. Additionally, they acknowledged that they had no evidence to establish that Radke knew or should have known of pollution activity or that Radke participated in any cover up of such activity. In response to Radke's requests for production, the plaintiffs produced no evidence or documentation which might tend to prove any element of the fault against Radke asserted in their pleadings.

4

Mr. Day stated, in his affidavit, that using his twenty-two years of experience in geological, hydrogeological, and environmental areas, he researched and mapped the location of the sixty-six Radke wells identified by the plaintiffs in their pleadings, as well as numerous other wells located near or adjacent to the plaintiffs' properties. Based on his research, Mr. Day determined that none of the Radke wells were located in Sections 42 or 43, Township 9 South, Range 2 West, Acadia Parish, Louisiana, but rather, were located in Sections 41, 46, 47, and 48 of Township 9 South, Range 2 West. He determined that the closest Radke well to the plaintiffs' property in Section 42 is no closer than 0.95 miles from the westernmost parcel and as far as 0.39 miles from the easternmost parcel. With regard to the plaintiffs' property in Section 43, he found that the closest Radke well is no closer than 1.1 miles from the westernmost parcel and as far as 0.95 miles from the easternmost parcel. Furthermore, based on information he obtained from the Louisiana Department of Natural Resources (DNR), Mr. Day found that 136 wells, operated by parties other than Radke, were located within the 0.95 mile stretch between the closest Radke well and the easternmost boundary of the plaintiffs' properties. Additionally, he noted that approximately nineteen wells were located on or immediately adjacent to the plaintiffs' properties, and a total of 849 wells were operated in the land stretching from the easternmost Radke well and the westernmost portion of the plaintiffs' properties.

Mr. Day voiced no opinion concerning the possibility of leakage from storage facilities on the plaintiffs' lands or of leakage from pipes or flow lines transporting the petroleum or waste product from the producing wells to the storage areas identified as being (or having been) on the plaintiffs' lands or in close proximity thereto. Instead, he limited his opinion to the plaintiffs' assertions of

5

leaks, spills, and discharges from the well locations causing damage to their property. In that regard, he opined that no spill or leak from the Radke wells would affect the plaintiffs' properties because these two areas are situated on either side of the lowest elevation in the Jennings Field, which is approximately five to ten feet above mean sea level. He stated that the plaintiffs' properties are located at approximately twenty-five to thirty feet above mean sea level. Mr. Day further determined that based on the north to northwesterly flow of shallow groundwater in the area of the plaintiffs' properties, the groundwater would flow towards the Radke wells rather than from the Radke wells towards the plaintiffs' properties.

On January 17, 2012, the plaintiffs filed a brief in opposition to the summary judgment motion and attached the affidavit of Gregory W. Miller, a geologist and principal of ICON Environmental Service, Inc., a Baton Rouge, Louisiana company. In his affidavit, Mr. Miller asserted that he is a geologist with over twenty years of experience and that he was hired by the plaintiffs to determine whether the years of oil and gas exploration had caused soil and groundwater contamination of their properties. He did not specifically respond to Mr. Day's opinion concerning spills at the well sites. Instead, he asserted that he had reviewed historical aerial photographs, historical pit maps, and data from a related litigation to conclude that the contaminated condition of the plaintiffs' properties had been caused not by the oil and gas activity, but through the storage of oil and production wastes. Mr. Miller explained that both the oil and production waste produced through the drilling process were stored in earthen holding pits or tanks located a significant distance away from the production field in order to avoid encroachment on future well locations in the field. The oil and/or production waste was transported to the holding pits from the well site through six-inch

diameter surface flow lines. He determined this historical fact by overlaying 2007 aerial photographs of the plaintiffs' properties with historical pit maps.

Based on his study, Mr. Miller confirmed the presence of two holding pits on the plaintiffs' properties and four located adjacent to their properties. With these locations in mind, he then studied the location of flow lines indicated on the historic maps and determined that they connected the pits to the production areas located east of Highway 97. Mr. Miller asserted that he then plotted the locations of several of Radke's wells and determined that the flow lines to the six earthen pits "appear to originate from wells operated by Radke, among others." He summarized his findings by stating, "In my opinion, these flow lines transported oil production with some quantity of produced salt water from the Radke wells to these pits for storage[,]" and "In my opinion, the storage of oil production in these pits would result in contamination of the surrounding areas." Two days after the plaintiffs filed their opposition to the summary judgment motion, Radke filed a response to the opposition wherein it attached a second affidavit of Mr. Day. In this affidavit, Mr. Day pointed out that the maps relied on by Mr. Miller, to support his opinion that the flow lines from the earthen pits originated, in part, from the Radke Wells, contained no markings referencing the locations of the earthen pits, the flow lines, or the Radke wells at issue. He also noted that Mr. Miller concluded only that "these flowlines appear to originate from wells operated by Radke, among others[.] (Emphasis in affidavit.)

Mr. Day also directed the trial court to a reference publication identified as the Louisiana Geological Survey's September 2001 Public Information Series No. 9 document, entitled *Jennings Field – the birthplace of Louisiana's Oil Industry.* In referencing this publication, he attached copies of pages from the document

7

which clearly established the presence of large earthen pits in the field. According to Mr. Day, that document establishes that there were two periods of oil exploration in the Jennings Field: 1903 to 1912; 1939 to 1950. Based on the DNR database, he estimated that 946 wells were drilled in the Jennings Field between 1903 to 1912, and he acknowledged the presence of large earthen pits used for the storage of oil. A statement from the reference publication asserts, "Oil storage was often a problem during this period. A storage tank is shown in the left foreground, but larger volumes of oil were often stored in huge open pits. Armed guards would patrol the reservoirs, and ducks would sometimes land in these apparent 'lakes' of oil."

Mr. Day also directed the trial court's attention to a book entitled *Oil Field Trash: Life and Labor in the Oil Patch* by Bobby D. Weaver. He attached four pages from the book[3] relating to the history of oil and production waste storage wherein Mr. Weaver wrote that "[b]y mid-1917 open pit oil storage on the Gulf Coast was credited with creating a 2 percent to 8 percent seepage, which amounted to a loss of 8,000,000 barrels of oil per year." According to Mr. Weaver's book, "[t]he use of these massive open storage pits continued to some extent until 1919[.]" At that time, according to Mr. Weaver, the Texas Railroad Commission "issued a general ban on the practice of storing light oils in open earthen tanks." The excerpts from Mr. Weaver's book make no mention of when the practice was banned in Louisiana or whether the ban applied to production waste as well; nor did it address the pollution issue. It simply suggested that the practice of using massive open storage pits was stopped because of the amount of valuable oil that was being lost in the process. In the attached two pages, Mr. Weaver stated that

---

[3] The first two pages provide a partial history of oil storage problems along the "Gulf Coast," and the other two pages list the references Mr. Weaver used to reach the facts asserted on those two pages.

8

earthen pits were initially replaced by concrete tanks because of the shortage of steel due to World War I activity, and these type of storage tanks were continuously used in to the mid-1920's. However, by 1919, they were starting to be replaced on a regular basis with steel tanks.

Using the information from the two pages of Mr. Weaver's book, Mr. Day made the following statement in his affidavit:

> Due to seepage loss at a rate from 2% to 8%, earthen pits for storage of oil were discontinued in the Gulf Coast prior to 1920. Storage tanks were being constructed of steel, concrete or wood and were used extensively beginning in the early 1920's. By the mid 1930's to early 1940's, steel had totally replaced concrete or wood for storage tank construction[.]

We must note, however, that Mr. Day's opinion is based solely on Mr. Weaver's research which makes no mention of the conditions in the Jennings Field and appears to be limited to the situation in the Texas oil fields.

While basing the opinion cited above on information which may or may not have been applicable to the Jennings Field, Mr. Day did not stop his research at that point. He asserts in his affidavit that he also researched the sixty-six wells listed by the plaintiffs in their second-amended petition as being operated by Radke using DNR historical records, and he noted that Radke's first appearance in the Jennings Field was in 1947, when it commenced operations on six wells: the Jennings Oil Co-Heywood#1; the Radke Oil-Jules Clement #34; the Clement #12; the Jennings Oil Co-Heywood #3; the Jennings Oil-Clement-Heywood #5; and the Clement JOC #31. Based on his research, he concludes that by the time Radke entered the Jennings Field in 1947, steel tanks were being used for oil storage; thus, the prior existing flow lines and earthen pits which allegedly contaminated the plaintiffs' properties were never used by Radke.

9

After considering the arguments of counsel and reviewing the record before it, the trial court concluded that the plaintiffs did not "produce factual support sufficient to establish that [they] will be able to satisfy [their] burden of proof at trial" and, therefore, "there is no genuine issue of material fact." La.Code Civ. P. art. 966(C)(2). While providing no specific reasons for judgment, the trial court noted, in the verbal exchanges during the hearing on the motion, that there was an absence of proof concerning who maintained the pits and mishandled the product at the time of contamination and that Mr. Miller's assertion that the flow lines only appeared to originate from wells operated by Radke was not sufficient to establish, by a preponderance of the evidence, that they did in fact originate from those wells or that Radke was responsible for any pollution at the time it occurred.

In their first assignment of error, the plaintiffs assert that the evidence initially submitted by Radke in support of its motion was not sufficient to cause the burden of proof to shift to them as required by La.Code Civ.P. art. 966(C)(2). We disagree. While Mr. Day's affidavit addressed only the plaintiffs' claims associated with spills, leakage, and/or discharges from the well locations not situated on the plaintiffs' properties, the answers to interrogatories and responses (or lack of responses) to Radke's requests for production established that the plaintiffs had, at that time, not provided any proof of Radke's liability for the claims asserted. The showing made by Radke was sufficient to cause the burden to shift to the plaintiffs, as required by La.Code Civ.P. art. 966(C)(2). We find no merit in this assignment of error.

Next, the plaintiffs assert that the trial court applied a heightened evidentiary standard by rejecting their assertion that their response to the motion for summary

judgment established a genuine issue of material fact. We find no merit in this assignment of error as well.

While La.Code Civ.P. art. 966(C)(2) speaks in terms of the nonmovant being able to "satisfy his evidentiary burden of proof at trial," this does not require a determination of fact by the trial court. It simply requires the nonmovant to present evidence that if believed by the trier of fact, would allow he or she to prevail at a trial on the merits. In this case, and without considering Mr. Day's second affidavit, we find that nothing presented by the plaintiffs reaches that threshold. At best, Mr. Miller's affidavit establishes that the flow lines "appear" to originate from wells operated by Radke. This assertion, standing alone and if believed by the trier of fact, does not satisfy the plaintiffs' preponderance burden of proof. This is particularly true given the fact that it does not establish whether Radke was an operator of any of the wells at the time the oil and/or waste material was being transported through the flow lines or whether it assumed any responsibility for the actions of previous operators. We find no merit in this assignment of error.

## DISPOSITION

For the foregoing reasons, we affirm the trial court judgment granting the motion for summary judgment of Radke Oil Company, Inc., and dismissing the claims of the plaintiffs against it. We assess all costs of this appeal to the plaintiffs, Fernen Louis Andrepont, Stacy H. Britt, Rhonda Parsley Burger, Barbara Miller Chapman, Glenn D. Daigle, Sr., Anita D. Decker, the Fruge Children Trust, Raven Gotte, Jr., Carroll Hebert, David Wayne Hebert, Norman L. Hebert, Debra Lois Ivan, Aulden R. Miller, Kenneth L. Miller, Jr., Mona Benoit Parsley, Steven J. Simar, and Patricia A. Vidrine.

**AFFIRMED.**