| | | |
|---|---|---|
| JAHMAL TILLMAN AND JIRUS TILLMAN | * | NO. 2024-C-0419 |
| INDIVIDUALLY AND O/B/O | * | |
| ROSE TILLMAN | | COURT OF APPEAL |
| | * | |
| VERSUS | | FOURTH CIRCUIT |
| | * | |
| LAMMICO, PRACTICE | | STATE OF LOUISIANA |
| PROTECTION TRUST FUND, | * * * * * * * | |

**JAHMAL TILLMAN AND
JIRUS TILLMAN
INDIVIDUALLY AND O/B/O
ROSE TILLMAN**

**VERSUS**

**LAMMICO, PRACTICE
PROTECTION TRUST FUND,
THE STATE OF LOUISIANA,
THROUGH THE BOARD OF
SUPERVISORS OF THE
LOUISIANA STATE
UNIVERSITY AND
AGRICULTURAL
MECHANICAL COLLEGE,
AND LSU HEALTH SCIENCES
CENTER, WEST JEFFERSON
HOLDINGS, LLC,
WOLDENBERG VILLAGE,
INC., DURGA SURE, M.D.,
FRANK CULICCHIA, M.D.,
JOSHUA LOWENTRITT, M.D.,
AND MICHAEL PUENTE, M.D.**

APPLICATION FOR WRITS DIRECTED TO
CIVIL DISTRICT COURT, ORLEANS PARISH
NO. 2017-09836, DIVISION "I-14"
Honorable Lori Jupiter, Judge
* * * * * *
**Judge Dale N. Atkins**
* * * * * *

(Court composed of Judge Daniel L. Dysart, Judge Dale N. Atkins, Judge Rachael D. Johnson)

Kara Hadican Samuels
Amanda J. Francis
KARA HADICAN SAMUELS & ASSOCIATES, L.L.C.
4004 Canal Street
New Orleans, LA 70119

COUNSEL FOR RELATORS, Jahmal Tillman and Jirus Tillman, Individually and on Behalf of Rose Tillman

Ann Marie LeBlanc
Kathryn M. Caraway
Erica L. Andrews
CARAWAY LEBLANC, LLC
3936 Bienville Street
New Orleans, LA 70119


COUNSEL FOR RESPONDENTS, Dr. Joshua Lowentritt and Woldenberg Village, Inc.


**WRIT GRANTED; JUDGMENT REVERSED**
**AUGUST 27, 2024**

This is a medical malpractice action. Relators, Jahmal Tillman and Jirus Tillman, individually and on behalf of their deceased mother Rose Tillman ("Ms. Tillman"), seek supervisory review of the trial court's June 17, 2024 judgment, which granted the "Motion to Exclude Portions of the Testimony/Opinions of Dr. Jeffrey Zwerner" ("Motion to Exclude") filed by Respondents, Joshua Lowentritt, M.D. ("Dr. Lowentritt"), and Woldenberg Village, Inc. ("Woldenberg") (collectively "Respondents"). For the following reasons, we grant Relators' writ application and reverse the trial court's judgment.

## FACTUAL BACKGROUND AND PROCEDURAL HISTORY

*Petition for Damages*

On October 11, 2017, Relators filed a Petition for Damages ("Petition"), individually and on behalf of Ms. Tillman, in Orleans Civil District Court. Therein, Relators named as defendants the State of Louisiana, through the Board of Supervisors of the Louisiana State University and Agricultural Mechanical College, and LSU Health Sciences Center; West Jefferson Holdings, LLC, d/b/a West Jefferson Medical Center; Woldenberg; Practice Protection Trust Fund; Durga Sure, M.D. ("Dr. Sure"); Frank Culicchia, M.D. ("Dr. Culicchia"); Michael

1

A. Puente, M.D.; and Dr. Lowentritt. In their Petition, Relators explained that on March 25, 2012, Ms. Tillman, presented to the emergency department at West Jefferson Medical Center via EMS complaining of a severe headache and left-sided weakness. They further explained that after "[a] CT scan of the head . . . revealed a right basal ganglia bleed extending into the right lateral ventricular posterior horn," Dr. Sure, a neurosurgeon, recommended that Ms. Tillman be admitted to the Intensive Care Unit and receive a repeat CT scan in six hours. According to Relators' Petition, at this time, "Dilantin [(phenytoin)] was started for seizure prophylaxis." That same day, as the Petition stated, "Ms. Tillman was . . . admitted to the Cardiac Care Unit under the care of Dr. Frank Culicchia with a diagnosis of hemorrhagic stroke" and underwent a repeat CT scan. Relators averred that on March 26, 2012, a neurologist, Dr. John Freiberg ("Dr. Freiberg"), evaluated Ms. Tillman at Dr. Culicchia's request and "noted that Ms. Tillman was doing well, with no clear need for continued prophylactic, anti-convulsant medication." Relators also asserted that Dr. Freiberg "suggested that discontinuation of the antiepileptic drug, Dilantin, be considered."

Despite Dr. Freiberg's recommendation, as explained by Relators, "[o]n March 27, 2012, Dr. Sure noted that Ms. Tillman's neurological examination was improved, but ordered that Ms. Tillman was to continue receiving Dilantin." Further, according to Relators' Petition, "Dr. Sure ordered Benadryl every eight hours as needed for 'itching.'" Later, on March 29, 2012, as stated by Relators, "Ms. Tillman's neurological examination was described as 'stable,'" at which time "[t]ransfer to rehabilitation was . . . approved by neurosurgery." Relators contended that over the next month, Ms. Tillman continued to receive Dilantin, and she complained of symptoms indicative of an allergic reaction, including itching,

2

for which she also received medication though medical staff failed to document her symptoms.

As the Petition explained, after time at the West Jefferson Medical Center rehabilitation unit, Ms. Tillman was transferred to Woldenberg on April 27, 2012, on which date Dr. Lowentritt assumed care for Ms. Tillman and ordered that Ms. Tillman would continue to receive phenytoin. Relators contended that "Dr. Lowentritt never questioned why a patient without a personal history of seizures and a stable neurological exam required ongoing antiepileptic drug therapy." In early May 2012, as Relators explained, Ms. Tillman experienced a fever. Then, on May 8, 2012, according to Relators, nurses at Woldenberg noticed a change in Ms. Tillman's mental status; nurses documented that a rash on Ms. Tillman's body that had been attributed to Aleve had worsened, despite the discontinuation of Aleve and the application of a topical steroid; and Dr. Lowentritt ordered that Ms. Tillman be transferred back to West Jefferson Medical Center.

As Relators then explained in their Petition, after Ms. Tillman returned to West Jefferson Medical Center, on May 13, 2012, Dr. Christopher Dalinkus ("Dr. Dalinkus") "noted that he highly suspected [Drug Reaction/Rash with Eosinophilia and Systemic Symptoms ("DRESS")] syndrome present upon admission due to phenytoin," and "[t]he drug was finally discontinued." Relators contended that another doctor at West Jefferson Medical Center, Dr. Markalain Dery, "agreed with Dr. Dalinkus that phenytoin was the most likely cause of Ms. Tillman's symptoms" and "also suspected DRESS . . . syndrome." Despite the discontinuation of phenytoin and efforts to stabilize Ms. Tillman, her condition worsened, and she ultimately passed away on May 22, 2012. As asserted by Relators, "postmortem findings and clinical presentation including Ms. Tillman's

3

laboratory values were diagnostic for DRESS." Relators alleged that Ms. Tillman "suffered injuries, damages, and ultimately, a wrongful death . . . caused, contributed to, and/or precipitated by the negligence and/or departures from the proper standard of medical care of [multiple] Defendants," including Respondents.

***Motion to Exclude***

On February 21, 2024, Respondents filed their Motion to Exclude, wherein they moved to exclude portions of the testimony of Relators' dermatologist/dermatopathologist expert, Dr. Jeffrey Zwerner ("Dr. Zwerner") pursuant to La. R.S. 9:2794[1] and La. C.E. art. 702.[2] In their Motion to Exclude, Respondents asserted that the reasoning for their motion was because "[a]s it relates to Dr. Lowentritt and Woldenberg, this case involves alleged acts of medical negligence which raise issues peculiar to the particular medical specialty of internal medicine and physician treatment and nursing care within skilled nursing facilities" while Relators' "dermatology expert, Dr. Zwerner, has no training or experience in the practice of any medicine within any skilled nursing facility and is not a medical expert who may testify as to the degree of care which should be exercised by internal medicine physicians and nurses in skilled nursing facilities." Therefore, Respondents argued that Dr. Zwerner should not be allowed to provide testimony as to the standard of care, nor Respondents' alleged breach thereof.

---

[1] Louisiana Revised Statutes 9:2794 is titled "Physicians, dentists, optometrists, and chiropractic physicians; malpractice; burden of proof; jury charge; physician witness expert qualification."

[2] Louisiana Code of Evidence Article 702 provides the standard for admissibility of expert testimony.

As another basis for their Motion to Exclude, Respondents argued that opinions provided by Dr. Zwerner during his August 28, 2023 deposition were beyond the scope of his January 16, 2019 report and after the expert identification and reporting deadlines, thereby precluding Respondents from retaining an expert in a similar specialty to counter Dr. Zwerner's opinion. In particular, Respondents argued that Dr. Zwerner's January 2019 report indicated that he would "testify regarding medical causation and damages" and "would testify concerning dermatology and dermatopathology." According to Respondents' Motion to Exclude, their counsel understood that the only expert that would comment "on the standard of care of Dr. Lowentritt and/or Woldenberg would be [another expert,] Dr. [Michael] Ayati." However, as asserted in Respondents' Motion to Exclude, "during his deposition, Dr. Zwerner ventured into an area far outside his area of specialty and beyond his report wherein he merely focused on whether phenytoin was the cause of Mrs. Tillman's death and whether her death could have been prevented by her treating physicians." Respondents noted that in his report, Dr. Zwerner stated that he "believed that DRESS should have been considered a possible diagnosis at Woldenberg, and . . . opined that had the medication been stopped before or after [Ms. Tillman] was admitted to Woldenberg, she had a better chance of having a better outcome." Respondents further noted that in his report, Dr. Zwerner "never defined the standard of care relating to any defendant in the case nor did he state the standard of care was breached." Nonetheless, as asserted in Respondents' Motion to Exclude, Dr. Zwerner "did an about face," when questioned about Dr. Lowentritt and Woldenberg during his deposition, affirmatively responding that he was making opinions about the applicable standard of care of Dr. Lowentritt and the Woldenberg nurses.

5

*June 17, 2024 Judgment*

On April 18, 2024, the trial court conducted a hearing on Respondents' Motion to Exclude and took the matter under advisement at the close of the hearing. Then, on June 17, 2024, the trial court signed a judgment which granted Respondents' Motion to Exclude. It stated, in pertinent part:

> This matter came before this Court on April 18, 2024, pursuant to Defendant's [sic] *Motion to Exclude Portions of the Testimony/Opinions of Dr. Jeffery Zwerner* filed on February 21, 2024.
>
> . . . .
>
> **IT IS ORDERED, ADJUDGED, AND DECREED** that the Defendant's [sic] *Motion to Exclude Portions of the Testimony/Opinions of Dr. Jeffery Zwerner* is hereby **GRANTED**. Dr. Jeffery Zwerner is prohibited from testifying regarding the standard of care as it relates to Dr. Lowentritt and the nursing staff at Woldenberg Village.

Relators' timely writ application to this Court followed.

## ASSIGMENTS OF ERROR

In their writ application to this Court, Relators assert two assignments of error:

> A. The trial court erred in granting Defendants' Motion to Exclude Portions of the Testimony/Opinions of Dr. Jeffrey Zwerner and limiting Dr. Zwerner's testimony despite that Dr. Zwerner's methodology and opinions are unquestionably reliable under *Daubert* and its progeny; and
>
> B. The trial court abused its discretion in its restrictive interpretation of the Code of Evidence by improperly conditioning Dr. Zwerner's qualification based upon his specialty.

We begin our discussion with the standard of review.

## DISCUSSION

*Standard of Review*

6

"[T]o determine whether a physician possesses the requisite degree of knowledge or skill or whether he exercised reasonable care or diligence," courts are "guided by expert witnesses who are members of the medical profession and who are qualified to testify." *In re Boryca*, 2020-0670, 0671, 0672, 0673, p. 4 (La. App. 4 Cir. 8/11/21), 366 So.3d 110, 115 (citing *Jackson v. State through Charity Hosp. of La. at New Orleans*, 1994-2090, p. 3 (La. App. 4 Cir. 5/16/95), 655 So.2d 795, 797). The trial court has "broad discretion in determining whether expert testimony should be held admissible and who should or should not be permitted to testify as an expert." *Id.* (quoting *Johnson v. Morehouse Gen. Hosp.*, 2010-0387, 0488, p. 17 (La. 5/10/11), 63 So.3d 87, 99). Accordingly, this Court reviews evidentiary rulings regarding the admissibility of expert testimony under the abuse of discretion standard. *Leininger v. Heaney*, 2023-0574, p. 9 (La. App. 4 Cir. 8/15/24), ___ So.3d ___, ___, 2024 WL 3823429, at *4 (quoting *Schwarzenberger v. La. State Univ. Health Scis. Ctr. New Orleans*, 2017-0024, p. 6 (La. App. 4 Cir. 8/24/17), 226 So.3d 1200, 1205).

***Law and Analysis***

Louisiana Code of Evidence Article 702 provides the standard for admissibility of expert testimony. If a witness "is qualified as an expert by knowledge, skill, experience, training, or education" then the witness "may testify in the form of an opinion or otherwise if:"

> (1) The expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (2) The testimony is based on sufficient facts or data;
>
> (3) The testimony is the product of reliable principles and methods; and

7

(4) The expert has reliably applied the principles and methods to the facts of the case.

La. C.E. art. 702(A).

With regard to medical malpractice claims, this Court has stated that "[t]o prevail in a medical malpractice case, the plaintiff must establish the standard of care applicable to the charged physician, a violation by the physician of that standard of care, and a causal connection between the physician's alleged negligence and the plaintiff's injuries resulting therefrom." *McDaniel v. Reed*, 2000-2529, pp. 2-3 (La. App. 4 Cir. 10/3/01), 798 So.2d 1121, 1123 (citing La. R.S. 9:2794(A)). Further, "[w]here the alleged acts of negligence raise issues peculiar to the particular specialty involved, then only those qualified in that specialty may offer evidence of the applicable standard of care." *Id.* at p. 3, 798 So.2d at 1123 (citing La. R.S. 9:2794(A)(1)). However, the determination as to whether a specialist may testify as to the degree of care that should have been exercised is based on the "specialist's knowledge of the requisite subject matter, rather than the specialty within which the specialist practices." *Id.* This determination must be made "on a case by case basis." *Id.* (citing *McLean v. Hunter*, 495 So.2d 1298, 1302 (La. 1986)). That is, "[c]ase law . . . allows for physicians to testify in fields other than their own, when there is sufficient knowledge of the requisite subject matter." *Pennington v. Ochsner Clinic Found.*, 2017-0647, p. 10 (La. App. 4 Cir. 4/25/18), 245 So.3d 58, 65.

In *McDaniel*, this Court explained that "where medical disciplines overlap, specialists in one field may give expert testimony as to the standard of care applicable to areas of the practice of medicine common to both disciplines." 2000-2539, pp. 4-5, 798 So.2d at 1123 (citing *Soteropulos v. Schmidt*, 556 So.2d 276,

280 (La. App. 4th Cir. 1990). Moreover, this Court also held that "a patient's skin care is not peculiar to any one specialty and thus any qualified physician [can] testify as to the applicable standard of care." *Id.* (citing *Smith v. Juneau*, 1995-0724, p. 15 (La. App. 4 Cir. 4/9/97), 692 So.2d 1365, 1373). Additionally, in *McDaniel*, we explained that the fact that an expert is one type of doctor instead of a specialist in the field about which he or she testifies "applies only to the effect on the weight to be given to his testimony, not to its admissibility." *Id.* at pp. 5-6, 798 So.2d at 1124 (citing *Bernard v. Lott*, 1995-0167, p. 6 (La. App. 4 Cir. 12/28/95), 666 So.2d 702, 705).

Based on our review of the foregoing jurisprudence, we find that Relators' assertion that the trial court erred in granting Respondents' Motion to Exclude has merit because a specialist like Dr. Zwerner may provide standard of care testimony as to Respondents in this matter. Contrary to the Respondents' contentions, Dr. Zwerner as a dermatologist/dermatopathologist, is not prohibited from providing testimony and opinions as to their standard of care or as to their alleged breach thereof simply because Dr. Lowentritt is an internal medicine physician and Woldenberg is a skilled nursing facility. As Relators argue in their writ application to this Court, Dr. Zwerner is qualified to provide testimony as to Respondents' breach of the standard of care provided that Respondents' "failure to conduct a differential diagnosis in response to Ms. Tillman's alarming clinical symptoms— which included a rash, burning, itching, increasing eosinophils, and worrisome laboratory results—does not raise any issues 'peculiar to internal medicine,' which is notably not a specialized area of medicine in and of itself." That is, Dr. Zwerner is not offering testimony concerning the standard of care in an area peculiar to an internist or a skilled nursing facility, but only the standard of care as to his

specialty, skin care. *See Pennington*, 2017-0647, pp. 11-12, 245 So.3d at 65 (first quoting *Smith*, 1995-0724, 692 So.2d 1365; and then citing *Slavich v. Knox*, 1999-1540, pp. 5-6 (La. App. 4 Cir. 12/15/99), 750 So.2d 301, 304). Thus, Dr. Zwerner has knowledge in the requisite subject matter. Despite Respondents' arguments to the contrary, Louisiana law does not require Dr. Zwerner to have performed the exact same tasks as Dr. Lowentritt (i.e., practiced in a skilled nursing facility, instead of a hospital or clinic setting), "but, rather, looks to [his] knowledge on the subject matter to determine whether he[] qualifies as an expert witness." *See In re Boryca*, 2020-0670, 0671, 0672, 0673, p. 7, 366 So.3d at 116. Dr. Zwerner is a dermatologist/dermatopathologist whose qualifications as such have not been challenged by Respondents. The fact that Dr. Zwerner is a dermatologist/dermatopathologist, and not an internist, like Dr. Lowentritt, nor a physician who practices at a skilled nursing facility, such as Woldenberg, affects only the applicable weight that his testimony should be given, not to its admissibility.

Regarding Respondents' allegation that Dr. Zwerner's deposition testimony went beyond the scope of his expert report, we note that in his January 2019 report, Dr. Zwerner opined that Ms. Tillman "died as the result of DRESS related to phenytoin exposure" and described DRESS" as "a type of severe cutaneous drug eruption that can be caused by several classes of medications, including antiepileptics." As to Ms. Tillman's treatment at Woldenberg, Dr. Zwerner opined in his report that the rash that started after her admission to the facility and continued to worsen even after the facility stopped administering Aleve was likely, the initial development of phenytoin-induced DRESS. Further, Dr. Zwerner opined that if DRESS would have been considered while Ms. Tillman was at

10

Woldenberg, as he believes it should have been, "the phenytoin stopped, and supportive therapy promptly started," then "there is an excellent chance that her reaction to the medication would not have had the severe progression that it did." Considering these statements in Dr. Zwerner's report, we agree with Relators' contention that Dr. Zwerner did in fact identify breaches of Respondents' standard of care, such that his subsequent August 2023 deposition testimony should not have come as a surprise to them as they allege it did.

In sum, we find that the trial court abused its discretion in granting Respondents' Motion to Exclude and in limiting Dr. Zwerner's testimony.

## DECREE

For the foregoing reasons, we conclude that the trial court abused its discretion in granting Respondent's Motion to Exclude. Accordingly, we grant Relators' writ application and reverse the trial court's June 17, 2024 judgment.

**WRIT GRANTED; JUDGMENT REVERSED**